## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| JULIE FOX and PREENON HUQ, | Court File No. 0:21-cv-00689 |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| ALLY FINANCIAL INC.; ALPACA SECURITIES LLC; CASH APP INVESTING LLC; SQUARE INC.; DOUGH LLC; MORGAN STANLEY SMITH BARNEY LLC; E*TRADE SECURITIES LLC; E*TRADE FINANCIAL CORPORATION; E*TRADE FINANCIAL HOLDINGS, LLC; ETORO USA SECURITIES, INC.; FREETRADE, LTD.; INTERACTIVE BROKERS LLC; M1 FINANCE, LLC; OPEN TO THE PUBLIC INVESTING, INC.; ROBINHOOD FINANCIAL, LLC; ROBINHOOD MARKETS, INC.; ROBINHOOD SECURITIES, LLC; IG GROUP HOLDINGS PLC; TASTYWORKS, INC.; TD AMERITRADE, INC.; THE CHARLES SCHWAB CORPORATION; CHARLES SCHWAB & CO. INC.; FF TRADE REPUBLIC GROWTH, LLC ; TRADING 212 LTD.; TRADING 212 UK LTD.; WEBULL FINANCIAL LLC; FUMI HOLDINGS, INC.; STASH FINANCIAL, INC.; BARCLAYS BANK PLC; CITADEL ENTERPRISE AMERICAS, LLC; CITADEL SECURITIES LLC; MELVIN CAPITAL MANAGEMENT LP; SEQUOIA CAPITAL OPERATIONS LLC; APEX CLEARING CORPORATION; & THE DEPOSITORY TRUST & CLEARING CORPORATION, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Julie Fox and Preenon Huq, on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendants for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 16 of the Clayton Act, 15 U.S.C. § 26, state antitrust and consumer protection laws, and the common law as follows:

## INTRODUCTION

1.     This case is about the individual investors (the "Retail Investors") who invested their hard-earned money in the stock market and were stripped of the rights to control their investments due to a large, overarching, conspiracy to prevent the market from operating freely by artificially preventing Defendants from hemorrhaging losses that would result from their highly speculative short selling strategies.

2.     Retail Investors, or individual investors, are non-professional investors who make individual investments on their own behalf. Retail Investors purchase assets such as stocks, bonds, securities, mutual funds, and exchange traded funds (ETFs). They execute personal trades through websites, apps and trading platforms provided by brokerage firms or other investment service providers. Retail Investors tend to invest smaller amounts compared to institutional investors. They have little ability to influence market prices or market dynamics on their own.

3.     Generally, Retail Investors pay brokerages a fee or commission for personal trades to their brokerages.

4.      Some brokerages, like Defendant Robinhood, do not charge their user a fee per transaction, but instead earn revenue through rebates, kickbacks, and other payments from market makers like the Clearinghouse Defendants.

5.      Some individual investors are members of online financial discussion forums on Reddit, Facebook, TikTok, and elsewhere. In these public forums, individual investors share and discuss market research and observations and help like-minded peers benefit from their research, potentially identifying good opportunities for investment.

6.      Based on their research and observations, the Retail Investors, through stock brokerages, including the Brokerage Defendants, purchased and invested in certain stocks—Gamestop (GME), AMC Theaters (AMC), American Airlines (AAL), Bed Bath & Beyond (BBBY), Blackberry (BB), Express (EXPR), Koss (KOSS) Naked Brand Group (NAKD), Nokia (NOK), Sundial Growers Inc. (SNDL), Tootsie Roll Industries (TR), and Trivago NV (TRVG) (the "Relevant Securities")— they believed would grow, increase in price, and serve as good investment opportunities.

7.      Several large hedge funds and investment firms, including Citadel Enterprise Americas LLC, Citadel Securities LLC, Melvin Capital Management LP, and unnamed co-conspirators, acquired and possessed massive "short" positions in the Relevant Securities.

8.      Short sellers borrow shares or other interests in corporate stock, securities, or other assets. In so doing, they bet prices of the securities will decrease. If the stock prices in fact drop, a short seller buys the stock back at a lower price and returns it to the

lender. The difference between the sell price and the buy price is the profit. Short sellers essentially bet on a stock's failure or decline, rather than its success or increase in value.

9.     The Fund Defendants and other unnamed co-conspirators made short selling investments in the Relevant Securities. By doing this, they made highly speculative bets. When the Relevant Securities increased in value, due in large part to Retail Investors' purchases of the Relevant Securities and the increased stock prices, the Fund Defendants, Clearinghouse Defendants, and unnamed co-conspirators were exposed to potential losses of several billion dollars.

10.    As Retail Investors and others continued to purchase the Relevant Securities, the Fund Defendants, Clearinghouse Defendants, and unnamed co-conspirators were caught in a classic "short squeeze." A "short squeeze" occurs when a stock or other asset rises sharply in value, distressing short positions. Short selling investors are faced with a rapid increase in the shorted asset's value, exposing the short seller to increased and theoretically limitless loss. As the price of the asset rises, short sellers may face pressure to buy back stock to exit their short positions to mitigate their potential losses. In the absence of intervention, as short sellers exit their short positions to buy back stocks to cover their shorts, the purchase of stock further increases the price of the stock, thereby building a positive feedback loop that pressures more short sellers to buy back stock at increasingly expensive prices.

11.    The Brokerage Defendants, Fund Defendants, and Clearinghouse Defendants (together the "Defendants") conspired to prevent the Retail Investors from

buying any further stock and forcing Retail Investors to sell their Relevant Securities to artificially suppress stock prices of the Relevant Securities.

12.     On January 27, 2021, after the close of the stock market and before the open of the market the next day, the Fund Defendants coordinated and planned increased short volumes in anticipation of short calls on January 28, 2021.

13.     The Brokerage Defendants disabled all buy features on platforms, websites, and mobile applications under their control and/or ownership for the Relevant Securities, thereby leaving the Retail Investors with no choice but to sell or hold their rapidly depreciating stocks. The Brokerage Defendants disabled the buy features to ensure the stock prices for the Relevant Securities declined for the benefit of the hedge funds owned or associated with the Brokerage Defendants, in furtherance of the conspiracy. Other Brokerage Defendants displayed loading graphics on the landing pages for these Relevant Securities to prevent users from purchasing any more Relevant Securities. Plaintiffs and Class members faced with an imminent price decline of their positions in the Relevant Securities—because of the inability of Retail Investors to purchase shares—were pressured to sell their shares in the Relevant Securities at a lower price than they otherwise would have. Additionally, Defendants prevented Class members from purchasing more stock in the Relevant Securities.

14.     The Defendants and their co-conspirators forced Retail Investors to choose between selling the Relevant Securities at a lower price or holding their rapidly declining positions in the Relevant Securities. Defendants did so to drive down the price of the Relevant Securities.

15.     Defendants and their co-conspirators conspired to prevent the Retail investors from buying further stock in order to mitigate the Fund Defendants' exposure in their short positions. By forcing the Retail Investors to sell their Relevant Securities at lower prices than they otherwise would have, Defendants artificially reduced the value of the Relevant Securities the Retail Investors either sold or held.

## JURISDICTION AND VENUE

16.     Plaintiffs bring this action on their own behalf as well on behalf of the members of the Class to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 16 of the Clayton Act, 15 U.S.C. § 26, as well as any and all equitable relief afforded under the federal laws pleaded herein.

17.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under the Constitution, laws, or treaties of the United States.

18.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that (a) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from some defendants; and (b) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

19.     Jurisdiction and venue are proper in this judicial District pursuant to 28 U.S.C. § 1391(b) and (c), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District and a substantial portion of the affected interstate trade

and commerce was carried out in this District. Each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The conspiracy has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

20.     This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business throughout the United States, including in this District; (b) transacted in substantial amounts of the Relevant Securities throughout the United States; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

21.     The activities of the Defendants and all co-conspirators—whether unnamed or as of yet unknown—as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## **PARTIES**

### A.     **Plaintiff Julie Fox**

22.     Plaintiff Julie Fox at all relevant times was a resident of Litchfield, Minnesota.

23.     Plaintiff Fox has had an active account with Defendant Robinhood since 2017.

24.     In the early morning of January 28, 2021, before the market opening, Plaintiff Fox put in an order through Defendant Robinhood for $400 worth of Gamestop (GME) stock that was supposed to be executed at open.

25.     Plaintiff Fox's order never was executed. Instead, she received a message from Defendant Robinhood explaining her order had been unilaterally cancelled by Defendant Robinhood without her knowledge or consent.

26.     On January 29, 2021, Plaintiff Fox used Defendant Robinhood's services to purchase 24 shares of AMC stock for an average value of $13.50 per share. She also purchased a single share of GME stock—the maximum amount of GME stock Defendant Robinhood allowed her to purchase.

27.     Plaintiff Fox was subsequently prevented by Defendant Robinhood from selling her AMC shares later that day.

28.     As of the date of this filing, AMC's stock price is now significantly less than what it was when Plaintiff Fox made her purchase.

29.     Plaintiff Fox subsequently sold her share of GME stock at a 75% loss.

**B.     Plaintiff Preenon Huq**

30.     Plaintiff Preenon Huq at all relevant times was a resident of Plymouth, Minnesota.

31.     Plaintiff Huq at all relevant times had an active account with Defendant Robinhood.

8

32.     On January 28, 2021, Plaintiff Huq attempted to buy shares of AMC stock with his Robinhood account but was prevented from doing so because Defendant Robinhood had deactivated the "buy" features on its application due to the anticompetitive conspiracy.

33.     Plaintiff Huq was unable to search for the Relevant Securities on Defendant Robinhood's platform on January 28, 2021. Defendant Robinhood went so far as to make it appear that AMC stock did not exist on its platform.

**C.     Brokerage Defendants**

**a.  Defendant Ally Financial Inc.**

34.     Defendant Ally Financial Inc. ("Ally") is a Delaware corporation, with its headquarters located at Ally Detroit Center 500, Woodward Ave., Floor 10, Detroit, Michigan. Ally provides financial services including an electronic trading platform to trade financial assets. Ally sold Relevant Securities directly to members of the Class during the Class Period.

**b.  Defendant Alpaca Securities LLC**

35.     Defendant Alpaca Securities LLC ("Alpaca") is a Delaware corporation, with its headquarters at 20 N San Mateo Drive Suite 10, San Mateo, California. Alpaca provides financial services including an electronic trading platform to trade financial assets. Alpaca sold Relevant Securities directly to members of the Class during the Class Period.

**c.  Defendant Cash App**

36.     Defendant Cash App Investing LLC ("Cash App Investing") is a Delaware

corporation headquartered at 920, SW 6th Avenue Ste. 1200, Portland, Oregon. Cash App Investing is a wholly owned subsidiary of Square Inc. Cash App Investing provides financial services including an electronic trading platform to trade financial assets. Cash App Investing sold Relevant Securities directly to members of the Class during the Class Period. Square Inc. and Cash App Investing LLC are referred collectively as "Cash App."

37.    Defendant Square Inc. is a Delaware corporation with its headquarters located at 1455 Market Street, Suite 600, San Francisco, California.

### d.  Defendant Dough

38.    Defendant Dough LLC ("Dough") is a Delaware limited-liability corporation, with its headquarters located at 327 N. Aberdeen Street, Chicago, Illinois. Dough provides financial services including an electronic trading platform to trade financial assets. Dough sold Relevant Securities directly to members of the Class during the Class Period.

### e.  Defendant E*Trade

39.    Defendant Morgan Stanley Smith Barney LLC ("Morgan Stanley") is a Delaware limited-liability corporation and parent company of E*Trade, with its headquarters located at 1585 Broadway Avenue, New York, New York. Morgan Stanley is the owner and ultimate parent of E*Trade Securities LLC, E*Trade Financial Corporation, and E*Trade Financial Holdings. Morgan Stanley, E*Trade Securities LLC, E*Trade Financial Corporation, and E*Trade Financial Holdings are collectively referred to as "E*Trade."

40.    Defendant E*Trade Securities LLC is a Delaware limited-liability

corporation, with its headquarters at 671 North Glebe Road, Ballston Tower, Arlington, Texas.

41.     Defendant E*Trade Financial Corporation is a Delaware corporation, with its headquarters at 671 North Glebe Road, Ballston Tower, Arlington, Texas.

42.     Defendant E*Trade Financial Holdings, LLC is a Delaware limited-liability corporation, with its headquarters at 671 North Glebe Road, Ballston Tower, Arlington, Texas.

### f.   Defendant eToro

43.     Defendant eToro USA Securities, Inc. ("eToro") is a Delaware corporation and owner of the application eToro, headquartered at 221 River St., 9th floor, Hoboken, New Jersey. eToro provides financial services including an electronic trading platform to trade financial assets. eToro sold Relevant Securities directly to members of the Class during the Class Period.

### g.   Defendant Freetrade

44.     Defendant Freetrade, Ltd. ("Freetrade") is a company incorporated in the United Kingdom, headquartered at 32-38 Leman Street, London, United Kingdom. Freetrade provides financial services including an electronic trading platform to trade financial assets. Freetrade sold Relevant Securities directly to members of the Class during the Class Period.

### h.   Defendant Interactive Brokers

45.     Defendant Interactive Brokers LLC ("Interactive Brokers") is a Delaware limited-liability corporation headquartered at 1 Pickwick Plaza, Greenwich, Connecticut.

Interactive Brokers provides financial services including an electronic trading platform to trade financial assets. Interactive Brokers sold Relevant Securities directly to members of the Class during the Class Period.

### i.   Defendant M1 Finance

46.     Defendant M1 Finance, LLC ("M1 Finance") is a Delaware corporation headquartered at 200 North La Salle Street, Suite 800, Chicago, Illinois. M1 Finance provides financial services including an electronic trading platform to trade financial assets. M1 Finance sold Relevant Securities directly to members of the Class during the Class Period.

### j.   Defendant Public.com

47.     Defendant Open To The Public Investing, Inc. ("Public.com") is a New York corporation, headquartered at 1 State Street Plaza, 10th Floor, New York, New York. Public.com provides financial services including an electronic trading platform to trade financial assets. Public.com sold Relevant Securities directly to members of the Class during the Class Period.

### k.   Defendant Robinhood

48.     Defendant Robinhood Markets, Inc. is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California. Defendant Robinhood Markets, Inc. is the corporate parent of and controls the affairs of Defendants Robinhood Financial, LLC and Robinhood Securities, LLC.

49.     Defendant Robinhood Financial, LLC is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California. It is a wholly-

owned subsidiary of Robinhood Markets, Inc.

50.     Defendant Robinhood Securities, LLC is a Delaware corporation with its principal place of business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida. It is a wholly owned subsidiary of Defendant Robinhood Markets, Inc. Defendant Robinhood Financial (collectively, with Robinhood Financial, LLC and Robinhood Markets, Inc. as "Robinhood").

51.     Robinhood provides financial services including an electronic trading platform to trade financial assets. Robinhood sold Relevant Securities directly to members of the Class during the Class Period.

**l.  Defendant Stash**

52.     Defendant Barclays Bank PLC is a company incorporated in the United Kingdom, and headquartered at 745 7th Ave New York, New York. Barclays Bank PLC is the ultimate corporate parent of, and controls the affairs of Stash Financial, Inc.

53.     Defendant Stash Financial, Inc. ("Stash") is a Delaware corporation and owner of the application Stash, headquartered at 500 7th Avenue,18th Floor, New York, New York. Stash is a wholly-owned subsidiary of Barclays Bank PLC. Stash provides financial services including an electronic trading platform to trade financial assets. Stash sold Relevant Securities directly to members of the Class during the Class Period.

**m. Defendant Tastyworks**

54.     Defendant IG Group Holdings PLC is a Delaware public limited company and ultimate corporate parent of and controls the affairs Tastyworks, Inc., headquartered at 200 West Jackson Blvd., Suite 1450, Chicago, Illinois.

55.     Defendant Tastyworks, Inc. is a Delaware corporation and wholly-owned subsidiary of IG Group Holdings PLC, headquartered at 100 West Fulton Market Street, Suite 220, Chicago, Illinois (IG Holdings and Tastyworks, Inc. collectively, "Tastyworks").

56.     Tastyworks provides financial services including an electronic trading platform to trade financial assets. Tastyworks sold Relevant Securities directly to members of the Class during the Class Period.

### n.  Defendant TD Ameritrade

57.     Defendant The Charles Schwab Corporation is a Delaware corporation with its principal place of business at 211 Main Street, San Francisco, California. The Charles Schwab Corporation is the ultimate corporate parent of and controls the affairs of Charles Schwab & Co., Inc. and TD Ameritrade Inc.

58.     Defendant Charles Schwab & Co. Inc. is a California corporation with its principal place of business at 211 Main Street, San Francisco, California. Charles Schwab & Co. Inc. is a wholly owned subsidiary of The Charles Schwab Corporation.

59.     Defendant TD Ameritrade, Inc., is a New York corporation with its principal place of business in Illinois. As of October 2020, The Charles Schwab Corporation acquired TD Ameritrade, Inc. The Charles Schwab Corporation, Charles Schwab & Co., Inc. and TD Ameritrade, Inc. collectively, "TD Ameritrade." TD Ameritrade provides financial services including an electronic trading platform to trade financial assets. TD Ameritrade sold Relevant Securities directly to members of the Class during the Class Period.

14

### o.  Defendant Trade Republic

60.     Defendant FF Trade Republic Growth, LLC ("Trade Republic") is a
Delaware corporation, headquartered at One Letterman Drive, Building D, 5th Floor, San
Francisco, California. Trade Republic provides financial services including an electronic
trading platform to trade financial assets. Trade Republic sold Relevant Securities directly
to members of the Class during the Class Period.

### p.  Defendant Trading 212

61.     Defendant Trading 212 Ltd. is a Bulgarian company headquartered at 3
Lachezar Stanchev Str., Litex Tower, Floor 10, Sofia 1797, Bulgaria. Trading 212 Ltd. is
the ultimate corporate parent of and controls the affairs of Trading 212 UK Ltd.

62.     Defendant Trading 212 UK Ltd. is a company incorporated in the United
Kingdom headquartered at 107 Cheapside, London, United Kingdom. Trading 212 UK
Ltd. a wholly-owned subsidiary of Trading 212 Ltd. (Trading 212 Ltd. and Trading 212
UK Ltd. collectively, "Trading 212"). Trading 212 provides financial services including
an electronic trading platform to trade financial assets. Trading 212 sold Relevant
Securities directly to members of the Class during the Class Period.

### q.  Defendant WeBull

63.     Defendant Fumi Holdings, Inc. is a Chinese corporation. Fumi Holdings,
Inc. and headquartered in Hunan, China. Fumi Holdings, Inc. is the corporate parent of,
and controls the affairs of WeBull Financial LLC.

64.     Defendant WeBull Financial LLC ("WeBull") is a Delaware corporation
and wholly-owned subsidiary of Fumi Holdings, Inc., headquartered at 44 Wall Street,

Ste 501, New York, New York. WeBull is a wholly-owned subsidiary of Fumi Holdings, Inc. WeBull provides financial services including an electronic trading platform to trade financial assets. WeBull sold Relevant Securities directly to members of the Class during the Class Period.

**D.     The Fund Defendants**

> **a.  Defendant Citadel**

65.     Defendant Citadel Enterprise Americas LLC ("Citadel") is a Delaware limited-liability corporation, headquartered at 131 South Dearborn Street, Chicago, Illinois. Citadel Enterprise Americas LLC is the corporate parent of, and controls the affairs of Citadel Securities LLC.

66.     Defendant Citadel Securities LLC is a Delaware limited-limited corporation, headquartered at 131 South Dearborn Street, Chicago, Illinois. Citadel Securities LLC is a wholly-owned subsidiary of Citadel Enterprise Americas LLC. Citadel Enterprise Americas, LLC and Citadel Securities LLC collectively, "Citadel."

67.     Defendant Citadel took short positions in the Relevant Securities. Citadel actively participated in the conspiracy and the wrongful acts alleged herein.

> **b.  Defendant Melvin Capital**

68.     Defendant Melvin Capital Management LP ( "Melvin Capital") is a Delaware limited partnership headquartered at 535 Madison Avenue, 22nd Floor, New York, New York.

69.     Defendant Melvin Capital took short positions in the Relevant Securities. Melvin Capital actively participated in the conspiracy and the wrongful acts alleged

herein.

### c. Defendant Sequoia

70.     Defendant Sequoia Capital Operations LLC ("Sequoia") is a Delaware limited-liability corporation, headquartered at 2800 Sand Hill Road, Suite 101, Menlo Park, California.

71.     Defendant Sequoia actively participated in the conspiracy and the wrongful acts alleged herein.

### E.     Clearinghouse Defendants

### a. Defendant Apex

72.     Defendant Apex Clearing Corporation ("Apex") is a New York corporation headquartered at One Dallas Center, 350 N. St. Paul, Suite 1300, Dallas, Texas.

73.     Defendant Apex participated in the conspiracy and the wrongful acts alleged herein.

### b. Defendant Depository Trust & Clearing Corporation

74.     Defendant The Depository Trust & Clearing Corporation ("DTCC") is a New York company headquartered at 55 Water Street, New York, New York.

75.     Defendant DTCC participated in the conspiracy and the wrongful acts alleged herein.

### <u>AGENTS AND CO-CONSPIRATORS</u>

76.     The anticompetitive and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered, or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively

engaged in the management, direction, or control of the Defendants' businesses or affairs.

77.     The Defendants' agents operated under the explicit and apparent authority of their principals.

78.     Each Defendant, and its subsidiaries, affiliates and agents operated as a single unified entity.

79.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

80.     Each Defendant acted as the principal, agent, or joint venture of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## CLASS ACTION ALLEGATIONS

81.     Plaintiffs bring this action for damages and injunctive relief on behalf of themself and all others similarly situated as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Class:

> All persons or entities in the United States that directly purchased, or attempted to purchase, securities in GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), American Airlines Group Inc. (AAL), Bed Bath & Beyond Inc. (BBBY), BlackBerry Ltd. (BB), Express, Inc. (EXPR), Koss Corporation (KOSS), Naked Brand Group Ltd. (NAKD), Nokia Corp. (NOK), Sundial Growers Inc. (SNDL),

Tootsie Roll Industries, Inc. (TR), or Trivago N.V. (TRVG) from one or more of the Defendants between January 1, 2021 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

82.     This Class definition specifically excludes the following person or entities:

     a.     Any of the Defendants named herein;

     b.     Any of the Defendants' co-conspirators;

     c.     Any of Defendants' parent companies, subsidiaries, and affiliates;

     d.     Any of Defendants' officers, directors, management, employees, subsidiaries, affiliates, or agents;

     e.     All governmental entities; and

     f.     The judges and chambers staff in this case, as well as any members of their immediate families.

83.     Plaintiffs do not know the exact number of Class members, because such information is in Defendants' exclusive control. Plaintiffs are informed and believe, due to the nature of the trade and commerce involved, there are millions of Class members geographically dispersed throughout the United States and elsewhere, such that joinder of all Class members in the prosecution of this action is impracticable.

84.     Plaintiffs' claims are typical of the claims of their fellow Class members because Plaintiffs directly purchased or attempted to purchase stocks and instruments via the Brokerages. Plaintiffs and all Class members were damaged by the same wrongful

conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

85.     Plaintiffs will fairly and adequately represent the interests of the Class because they purchased or attempted to purchase the Relevant Securities directly from the one or more of the Defendants and have no conflicts with any other members of the Class. Furthermore, Plaintiffs have retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation.

86.     Numerous questions of law or fact common to the entire Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

      a.   whether Defendants combined or conspired with one another to artificially suppress prices for the Relevant Securities at any time during the Class Period to purchasers in the United States;

      b.   whether Defendants combined or conspired with one another to fix, raise, maintain, stabilize, and/or suppress prices for Relevant Securities at any time during the Class Period to purchasers in the United States;

      c.   whether Defendants' conduct caused the prices of the Relevant Securities, sold or held by the Retail Investors in the United States at any time during the Class Period to be artificially fixed, suppressed, maintained or stabilized;

      d.   whether Plaintiffs and the other members of the Class were injured

by Defendants' conduct and, if so, the appropriate Class-wide

measure of damages; and

e.  whether Plaintiffs and other members of the Class are entitled to,

among other things, injunctive relief, and, if so, the nature and extent

of such relief.

87.     These and other questions of law and fact are common to the Class and

predominate over any questions affecting the Class members individually.

88.     Defendants have acted on grounds generally applicable to the Class,

thereby making final injunctive relief appropriate with respect to the Class as a whole.

This class action is superior to alternatives, if any, for the fair and efficient adjudication

of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate

the possibility of repetitive litigation. There will be no material difficulty in the

management of this action as a class action.

89.     The prosecution of separate actions by individual Class members would

create the risk of inconsistent or varying adjudications, establishing incompatible

standards of conduct for Defendants.

## FACTUAL ALLEGATIONS

90.     Retail Investors participate in online financial discussion forums, including

but not limited to Reddit, Facebook, and TikTok. Through these forums, and elsewhere,

Retail Investors are able to trade information about their market observations and help

like-minded peers benefit from their research. During the Relevant Period, Retail

Investors communicated and exchanged information regarding the Relevant Securities.

21

91.     Based on their research, the Retail Investors, through stockbrokers such as the Brokerage Defendants, invested in the Relevant Securities they believed would increase in price.

92.     The Fund Defendants and unnamed co-conspirators purchased and held "short" positions in the Relevant Securities. By the nature of the short positions, the Fund Defendants, the Clearinghouse Defendants, and certain unnamed co-conspirators stood to benefit and substantially profit were the prices of the Relevant Securities to decrease. Short-selling is highly speculative. In a free and open market, there would be substantial financial risk that prices might increase causing the short sellers to cover the contract at a loss.

93.     The Fund Defendants, Clearinghouse Defendants, and unnamed co-conspirators predicted incorrectly. The Relevant Securities grew in value, thereby exposing the Defendant Funds and Clearing Houses to billions of dollars in losses.

94.     Rather than facing the consequences of their risky bets, the Fund Defendants, Clearinghouse Defendants, and their co-conspirators entered into an agreement and conspiracy to prevent the market from operating freely by preventing a decrease in the prices of the Relevant Securities thereby avoiding their own financial loss, to the financial detriment of Plaintiffs and the members of the Class.

95.     Defendants' conspiracy has drawn congressional scrutiny. On February 18, 2021, the House Financial Services Committee held the first of what is expected to be several hearings related to Defendants' January 28, 2021 trading restrictions. Chairwoman

Maxine Waters announced she expects to hold at least two more hearings related to the trading restrictions.

## Background

96.     Retail Investors or individual investors are non-professional investors who execute personal trades through brokerage firms or investment accounts.

97.     Retail Investors discuss and exchange information regarding investments including the Relevant Securities on financial discussion forums on public social networking sites like Reddit, Facebook, Twitter, TikTok and Discord.

98.     Many of the Brokerage Defendants represented to the Retail Investors they were offering free brokerage services to facilitate fair trading in the stock market.

99.     The Brokerage Defendants are stockbrokers running online platforms from which Plaintiffs and other Retail Investors directly purchase and sell securities during the Class Period.

100.    The Retail Investors identified as early as 2019 that Gamestop's (GME) stock value was lower than they expected it to be based on Gamestop's publicly available financial disclosures and future prospects.

101.    For example, despite Gamestop being a brick-and-mortar store specializing in video games that can now be downloaded from a person's home, Gamestop possessed ample cash reserves and was regularly paying off its debts and was presented new opportunity with the release of the next generation of gaming platforms. Despite these facts, in 2019, Gamestop's stock was valued as low as $3 per share. Retail Investors

correctly deduced Gamestop was undervalued because large financial institutions had taken large short positions, essentially betting on Gamestop's failure. Due to Gamestop's low stock price, the Retailer Investors correctly determined Gamestop represented an investment opportunity.

102.    Retail Investors invested in the other Relevant Securities in addition to Gamestop based on their valuation and anticipated business performance. For example, Retail Investors invested in Nokia (NOK) because Nokia, which had historically focused its business on the manufacture and sale of mobile phone handsets, had been expanding in other industries, including investing in 5G communication networks, including towers and other infrastructure.

103.    Like other Retail Investors, Plaintiffs purchased "long" positions in these companies, including stocks, option contracts, and other securities.

104.    In a free and open market, stock prices are determined by the laws of supply and demand as purchasers and sellers bid and ask stock prices. As more investors buy a certain stock, and bid up the stock's prices, the market price for the stock rises. Conversely, as investors sell stock, the stock price is bid down and the market price for the stock declines.

105.    If an investor has long positions, it means the investor has bought and owns those shares of stocks. This is in contrast to a short position, where the investor owes those stocks to someone, but does not actually own them yet. Investors holding long positions generally own the stock with the expectation that it will rise in value and it will be worth more than they paid for it. When the investor sells a long position, the profit or

loss from the same is the difference between the purchase price of the security and the sale price of the security.

106.    Retail Investors took long positions in the Relevant Securities with the expectation that the stock would increase in value, generally because they believed the respective companies' business prospects were improving. Investors in the Relevant Securities generally believed they were good investment opportunities, and that prices of their securities would rise as can be expected when a market is operating freely, without fraud, conspiracy, or manipulation.

107.    Institutional investors, including the Fund Defendants and unnamed co-conspirators, acquired massive "short" positions in the Relevant Securities.

108.    As indicated above, "short" sellers borrow shares of an asset they believe will fall in price only to buy them after the asset depreciates in value. Short sellers essentially bet on an asset's failure rather than its success. Profit is made in the difference between the value lost at the time sold versus when the time when the short position is bought. For example, a short seller borrows a share of Company X (for a fee) from a broker which is presently valued at $10. The short seller immediately sells the share and waits for the value of the share to drop. The share price then falls to $4. The short seller then purchases the share at the reduced value of $4 and returns it to the lender and earns the difference of $6. Short sales are often time limited. On the other hand, if the price of the share rises to $20, the short seller would need to purchase the share at $20 to return it to the lender, thereby incurring a loss of $10.

109.     To a short seller, the more a stock price increases, the greater the loss to the short seller. The theoretical loss to a short investor who predicts wrongly is potentially infinite. Should a short seller want to exit a short position in the face of rapidly increasing stock price, they must "buy back" the stock at the higher price to return to the institution they borrowed the share from. Risk from bad short selling investments is potentially ruinous and catastrophic.

110.     On the other hand, an investor who purchases a stock "long" is limited to a maximum loss of the price of an asset potentially decreasing to zero.

111.     Defendant Melvin Capital, for example, shorted approximately 140% of Gamestop's total stock. The practice of short selling more shares than exists is itself an illegal practice known as "naked shorting." In a "naked" short sale, a seller does not borrow or arrange to borrow the necessary securities in time to deliver them to the buyer within the standard three-day settlement period. Although abusive, "naked" short selling is not defined in the federal securities laws, it refers generally to selling short without having stock available for delivery and intentionally failing to deliver stock within the standard three-day settlement period.

112.     As a result of Retail Investors purchasing long positions in the Relevant Securities, the stock price of these companies began to rise. As the value of the Relevant Securities increased, this resulted in a "short squeeze."

113.     A short squeeze occurs when a stock or other asset rises sharply in value, distressing short positions in the asset. A short squeeze is when investors in short positions are faced with a rapid increase in the shorted asset's value, exposing the short

seller to increased loss. As the price of the asset rises, short sellers may face pressure to buy back stock to exit their short positions to mitigate their losses. In the absence of intervention, as short sellers exit their short positions to buy back stocks to cover their shorts, the purchase of stock further increases the price of the stock.

114.     For example, with regard to Gamestop, a popular Reddit user who also creates content on YouTube under the handle Roaring Kitty ("Roaring Kitty") had reason to believe hedge funds had entered into these short positions with respect to Gamestop's stock. Based on his own financial analysis, Roaring Kitty determined Gamestop was actually undervalued due to coordinated shorting of Gamestop by numerous funds and made an initial purchase of $50,000 of Gamestop stock and published his investments on the Reddit financial discussion forum WallStreetBets.

115.     WallStreetBets is a public financial discussion forum on Reddit. WallStreetBets is characterized by a culture centered around discussion of financial investments and memes. Many users on WallStreetBets are sophisticated, financially savvy Retail Investors with business acumen.

116.     Roaring Kitty regularly updated and continued to publish information and analysis that Gamestop stocks were undervalued. In August 2020, Roaring Kitty posted an in-depth analysis of Gamestop's stock on his YouTube channel, walking his subscribers through his extensive analysis of the value proposition of the stock.

117.     Attention to Gamestop's stock was not limited to online financial communities and discussion forums. Dr. Michael Burry (who gained fame for his investment decisions in relation with correctly predicting the 2008 financial crisis as

presented in the film *The Big Short*) and his investment firm Scion Asset Management, LLC spent nearly $15 million to purchase stock in Gamestop in 2019 at share prices between $2 and $4.20 per share for a 5% ownership position in Gamestop. Retail Investors took notice and Gamestop's price steadily increased.

118.    Ryan Cohen, the co-founder and former CEO of the pet e-commerce website Chewy.com, invested $76 million and acquired a 12.9% stake in Gamestop in 2020. Several Retail Investors were optimistic about Ryan Cohen's involvement in Gamestop, who joined the board of directors on January 11, 2021.

119.    Institutional investors, holding large short positions in Gamestop's stock and other Relevant Securities began to push back and attempted to message on media and elsewhere that the Relevant Securities were not as valuable as the Retail Investors thought. For example, on January 21, 2021, when Gamestop was valued at approximately $20 per share, Andrew Left, the founder of Citron Research, a capital research and investment firm, gave an interview explaining why he was shorting Gamestop.

120.    In response, Retail Investors further went long on Gamestop and other Relevant Securities. Given the operation of a free and open market, the prices of Gamestop and other Relevant Securities was bid up and prices increased. This exposed short sellers in those stocks, including the Fund Defendants, to substantial loses. It was a textbook short squeeze.

121.    On January 21, 2021, the Relevant Securities' stock prices increased substantially. For example, on January 8, 2021, Gamestop's stock was priced at $17.69 per share. On January 27, 2021, driven by investments from Retail Investors, Gamestop's

stock closed at $347.51. Other Relevant Securities experienced similar increases.

122.    The figure below summarizes the prices of Gamestop's stock from December 28, 2020 through January 29, 2021.



123.    The figure below summarizes the prices of Nokia Corporation's stock from December 28, 2020 through January 29, 2021.



124.    The figure below summarizes the prices of American Airlines Group Inc.'s stock from December 28, 2020 through January 29, 2021.



125.    The figure below summarizes the prices of Sundial Growers Inc.'s stock from December 28, 2020 through January 29, 2021.



126.    The figure below summarizes the prices of Naked Brand Group Limited's stock from December 28, 2020 through January 29, 2021.



127.    The figure below summarizes the prices of AMC Entertainment Holdings, Inc.' stock from December 28, 2020 through January 29, 2021.



128.    The figure below summarizes the prices of Koss Corporation's stock from December 28, 2020 through January 29, 2021.



129.    The figure below summarizes the prices of Trivago stock from December 28, 2020 through January 29, 2021.



130.    The figure below summarizes the prices of Bed Bath & Beyond stock from December 28, 2020 through January 29, 2021.



131.    The figure below summarizes the prices of Express stock from December 28, 2020 through January 29, 2021.



132.    The figure below summarizes the prices of Tootsie Roll Industries Inc.'s

stock from December 28, 2020 through January 29, 2021.



133.    The figure below summarizes the prices of Blackberry's stock from December 28, 2020 through January 29, 2021.



134.    The tremendous growth of the Relevant Securities' stock price resulted in significant and potentially disastrous exposure of institutional investors, and hedge funds, including the Fund Defendants and their co-conspirators holding short positions in the Relevant Securities.

135.    Defendant Citadel Investments, for example, holds a significant interest in Defendant Melvin Capital (who had the illegal naked 140% short position) and was forced to inject around $3 billion along with another fund, Point72, to bailout Melvin Capital from its distressed short position.

136.    In essence, small Retail Investors concluded that institutional investors had severely undervalued the Relevant Securities by shorting them, presenting a good

investment opportunity. By investing in the undervalued Relevant Securities, the Retail Investors were outfoxing Wall Street at its own game.

### *The Illegal Scheme*

137.    Defendants hatched an anticompetitive scheme to limit trading in the Relevant Securities rather than compete and invest in opportunities in the market to recoup the loss in their short positions that the growth in the Relevant Securities' prices represented, or pay the price for their highly speculative, and failed, gamble.

138.    After the market closed on Wednesday, January 27, 2021, after-hours revealed suspicious coordinated trading activity. After-hours trading is not permitted for individual Retail Investors and is restricted to institutional investors such as hedge funds.



Analytics revealed a significant volume of GME short volume immediately prior to the markets opening on Thursday, January 28, 2021, i.e., after-hour traders were taking more short positions suggesting after-hour traders were trading in anticipation of a GME sell-off. The grey lines in chart below represent the volume of short positions in GME. As demonstrated by the grey lines below, the volume of short positions was much higher before January 28, 2021 than any of the prior days and had steadily increased the week prior.

139.    As described above, Retail Investors cannot engage in after-hours trading. This exponential increase in short volume is likely the result of institutional investors, like the Fund Defendants, taking new short positions.

140.    The dramatic increase in short positions was counterintuitive. Chatter in various financial discussion forums indicated high excitement and motivation on the part of Retail Investors to continue investing in the Relevant Securities. Many Retail Investors announced plans to increase positions in the Relevant Securities on January 28, 2021, which would mean the prices for the Relevant Securities were likely to go up, not down.

*The Events of Thursday, January 28, 2021*

141.    As the markets opened on January 28, 2021, the Retail Investors woke up to find the Brokerage Defendants and other unnamed brokerages had suddenly and without notice restricted their ability to buy long positions in the Relevant Securities. Pursuant to the anticompetitive scheme, the Brokerage Defendants implemented these changes on or about the same time. It would not have been in their economic interest to

do so, but for the illegal conspiracy.

142.     Retail Investors using Robinhood as their brokerage could no longer click on the "buy" option for any of the Relevant Securities. The "buy" button was deactivated as a feature, leaving users with no option but to sell their securities.

143.     Defendant Robinhood addressed the "Why don't I see a buy button?" question on its website here: https://robinhood.com/us/en/support/articles/why-dont-i-see-a-buy-button/ by offering three reasons why the buy button was disabled  on a user's account. The three stated reasons were: a) "It's a foreign stock, which we don't support." b) "It's an over-the-counter (OTC) stock or a warrant, which Robinhood generally doesn't support." c) "It's a stock undergoing corporate action. The stock will be tradable again once the corporate action has been finalized." Defendant Robinhood's explanation was nonsense because the Relevant Securities were not foreign stocks, OTC stocks, or stocks undergoing corporate actions during the Class Period. This explanation was incomplete and untrue.

144.     Retail Investors who had queued purchase orders overnight on January 27, 2021 to purchase stock when the markets opened on January 28, 2021 discovered their purchase orders had been cancelled without their consent. Some received messages that claimed "You canceled your order" despite having never having affirmatively done so.

Jan 27, 18:04

We've received your order to buy $100.00 of NOK.

If this order isn't filled by the end of market hours (4pm ET) on the next trading day, it will expire.

Jan 28, 08:27

You've canceled your order to buy $100.00 of NOK.

08:27

145.     The restrictions on trading took different forms but had the same effect. Retail Investors were prohibited from opening new long positions in the Relevant Securities. In other words, Retail Investors were not permitted to purchase new positions but were only permitted to sell their long positions.

146.    On Defendant Robinhood's web platform and mobile app, Retail Investors were blocked from searching for the Relevant Securities in Robinhood's app. In fact, their respective ticker symbols were not even searchable by Retail Investors. The market was essentially shut down with the purpose of benefitting the participants in the



conspiracy and with the intent to harm Plaintiffs and the members of the Class.

147.    Defendant Stash prohibited users from viewing tickers for the Relevant Securities, and Stash's pages only displayed loading graphics. Other tickers were under no such restriction and were easily searchable on the platform. Because of the Stash platform's design, a Retail Investor who cannot view the page for a particular asset

cannot trade in that asset. As a result, Retail Investors were unable to access the page for the Relevant Securities to open new long positions in the Relevant Securities.

148.    While there had been reports of increasing government attention from the SEC and even the administration in relation to these rapidly increasing prices of the Relevant Securities, there was no formal governmental guidance issued to restrict trading in these stocks in advance of January 28, 2021.

149.    Reporting throughout January 28, 2021, revealed the ban on purchasing stock of the Relevant Securities was widespread among brokerages. On information and belief, the Brokerage Defendants adopted similar, if not identical, restrictions to Retail Investors from opening new positions in all, or at least one or more of the Relevant Securities. It is unlikely they would have done so, but for the conspiratorial agreement. The market was essentially shut down with the purpose of benefitting the conspiracy participants to the detriment of Plaintiffs and the members of the Class.

150.    Pursuant to the illegal anticompetitive conspiracy, the coordinated prohibition on buying any new Relevant Securities—through the Brokerage Defendants' forced foreclosure on Retail Investors from buying Relevant Securities—led to a massive sell-off. This resulted in a steep decline in the stock prices for the Relevant Securities.

151.    For example, on January 28, 2021, Gamestop's stock fell 44.11% and closed at $193.60 per share. Retail Investors who wanted to take advantage of the price drop to buy more stock were prohibited because of the coordinated ban on purchasing.

152.    The prohibition on purchasing stock did not apply to all investors. Large investment firms such as the Fund Defendants faced no restrictions to purchasing the

Relevant Securities. Whereas Retail Investors were excluded from purchasing securities at the reduced rate. Investment firms holding short positions were permitted to cover their short positions by buying securities at the artificially reduced price.

153.    The coordinated prohibition on purchasing placed on Retail Investors quickly resulted in scrutiny from journalists and lawmakers. Defendant Robinhood in particular drew criticism from lawmakers on both sides of the aisle, including calls for congressional and DOJ investigation.

154.    On January 29, 2021, the SEC issued a formal letter announcing it was investigating the Defendants' actions of January 28, 2021.

155.    Robinhood's conflict-ridden relationship with the Fund Defendants quickly came to light. In addition to its financial interest in Defendant Melvin Capital, it was revealed Defendant Citadel regularly worked closely with Defendant Robinhood, serving as Defendant Robinhood's market maker over 60% of the time.

156.    Defendant Citadel also pays Defendant Robinhood for order flow. Payment for order flow is a kickback a brokerage firm receives for directing orders to third party-market makers, like Citadel, for trade execution.

157.    Reporting revealed Defendant Citadel had "reloaded" their short positions before instructing Defendant Robinhood to prohibit the purchases of Gamestop and other stocks.

158.    Employees of the Brokerage Defendants began to emerge as whistleblowers in online forums. A purported Robinhood employee reported on Reddit that Robinhood's founder, and other c-level executives, had received calls from

Defendant Sequoia Capital pressuring Robinhood into restricting trading in one or more of the Relevant Securities.

159.    Other brokerage firms took other overt acts in furtherance of the anticompetitive scheme. Certain brokerages sold off long positions in stocks without the permission of the investor.

160.    On January 28, 2021, the technology news website, The Verge, announced several Retail Investors complained   GME and AMC stock purchases filled by Robinhood, were later sold by Robinhood without the Retail Investors' knowledge or permission. Another Retail Investor reported a purchase of Naked Brand stock (NAKD) had been filled but subsequently sold without their consent. While Robinhood had warned investors that it may automatically sell off option contracts or assets purchased on margin, these investors denied they had purchased stocks on margin and did not purchase option contracts. These Retail Investors had purchased cash positions in the Relevant



Robinhood

### Important Information About Your Robinhood Account

Hi ████

In light of recent volatility, we are restricting transactions for certain securities to position closing only. However, due to the unreasonable risk involved in brokering your position, we have closed your 4,500 shares of GME for an average price of $118.93 on January 28th, 2021 at 11:24 AM.

Securities that were sold off without their knowledge or consent.

161.    Defendants were aware they were colluding to manipulate the market. In

an interview given by Defendant Interactive Brokers' chairman Thomas Peterffy, Mr.

Peterffy admitted Interactive Brokers restricted trading in order to "protect ourselves."

162.    The anticompetitive conspiracy was authorized, ordered, or performed by

the Defendants' respective officers, agents, employees, representatives, or shareholders

while actively engaged in the management, direction, or control of the Defendants'

businesses or affairs.

163.    At least 18 brokerages together prohibited Retail Investors from opening

new positions in GME, AMC and other Relevant Securities on January 28, 2021. Some

restricted Retailer Investors from opening new long positions in securities wholesale,

whereas others restricted purchasing options only. No brokerages restricted selling of

Relevant Securities by any investor, whether by a retail investor or large institutional

investor.

164.    Not all brokerages banned the purchase of the Relevant Securities. Even in

the cases where brokerages were allowing Retail Investors to open new long positions,

however, the Clearinghouse Defendants began to raise fees to purchase securities or

otherwise instruct brokerages to not consummate purchase orders.

165.    Brokerages route trades through clearinghouses which streamlines the

trading process. Some brokerages, such as Defendant Robinhood, serve as their own

clearinghouse. By increasing fees to purchase a particular stock, the clearinghouse can

suppress the number of purchases of that stock and affect the stock's price.

166.    The Clearinghouse Defendants raised the fees for consummating purchases

of the relevant stocks to the non-conspiring brokerages, further facilitating the Fund

Defendants covering of their short positions in furtherance of the conspiracy.

167.    Nondefendant brokerage SoFi momentarily had trading in the Relevant

Securities forcibly suspended by Clearinghouse Defendant Apex.



168.    SoFi quickly objected to Defendant Apex's attempt to restrict trading in the

Relevant Securities on SoFi's platform and trading was soon permitted on SoFi without

restriction.

169.    Anthony Denier, the CEO of Defendant WeBull Financial LLC, a

brokerage which had restricted trading in the Relevant Securities, placed the blame

squarely on its clearinghouse, Defendant Apex Clearing, for the restrictions on trading the

stocks. According to Denier, the collateral required by Apex for Gamestop increased by

100% and Apex had informed him that WeBull needed to shut off the ability to open new positions in certain stocks. Denier further said the restrictions originated the morning of January 28, 2021 and was informed that Apex was instructed by the Defendant Depository Trust & Clearing Corporation that it was increasing the collateral needed to settle trades for the Relevant Securities.

170.    Denier further said the restrictions originated the morning of January 28, 2021 and was informed Defendant Apex was instructed by Defendant Depository Trust & Clearing Corporation that it was increasing the collateral needed to settle trades for stocks such as Gamestop.

171.    Other brokerages such as Defendants Ally Financial Inc., M1 Finance, Tastyworks, and Public.com also reported that Defendant Apex had halted all opening transactions of Gamestop, AMC and Koss, which they blamed for trading restrictions of the Relevant Securities on their platforms.

172.    Similarly, Defendant Freetrade blamed Clearinghouse Defendant Barclay's PLC for its restrictions of the Relevant Securities on its platform.

173.    Defendant Trading212 uses Defendant Interactive Brokers as its intermediary and said Defendant Interactive Brokers was at fault for Defendant Freetrade's restrictions on the Relevant Securities.

174.    Defendants' conspiratorial acts resulted in lockstep price movements of the Relevant Securities that can only be explained by coordinated lockstep actions by Defendants, in particular when considering Retail Investors were only permitted to sell positions in the Relevant Securities.

175.     As demonstrated by the charts below, the stock prices of the Relevant
Securities moved almost in parallel with each other throughout January 28, 2021. The
charts revealed a coordinated rise in the prices of the Relevant Securities at
approximately 11:00-11:30 a.m. after the Relevant Securities took a steep dive after the
markets opened. At that time, few if any Retail Investors were permitted to purchase
positions in the Relevant Securities and only institutional investors such as the Fund
Defendants were permitted to purchase.



### *The Anticompetitive Scheme is Ongoing*

176.     Even in the face of increased scrutiny, Defendants continued their
anticompetitive scheme to suppress the price of the Relevant Securities.

177.     Partly as a result of criticism, the Brokerage Defendants nearly all

permitted Retail Investors to open new long positions in the Relevant Securities as the market opened on January 29, 2021.

178.    Defendant Freetrade, a brokerage based in the United Kingdom, citing concerns from its foreign exchange provider, restricted trades in United States securities altogether on January 29, 2021, after restricting purchases on January 28, 2021.

179.    While purchases were permitted, they were heavily restricted by the Brokerage Defendants. Nevertheless, Retail Investors, still believing in the value of these assets, continued to purchase stock in the Relevant Securities once they were permitted to.



180.    Many of the Brokerage Defendants restricted trading of long option

contracts and announced to Retail Investors they would close out their profitable option

positions automatically.

181.     The Relevant Securities began to regain the value lost the prior day as a result of Defendants' coordinated action to suppress the value of the stocks.

182.     Because the Fund Defendants and other unnamed conspirators still had distressed short positions outstanding, this threatened their ill-gotten gains achieved the day before.

183.     Defendant Robinhood limited users to purchasing a limited amount of stock. With respect to Gamestop, for example, Defendant Robinhood first restricted Retail Investors to purchasing only five shares of Gamestop, which resulted in a rapid decline in the value of Gamestop. As Gamestop's stock price recovered, Defendant



Robinhood further limited purchases to two shares.

184.     When the value of Gamestop again began to recover, Defendant Robinhood later instituted a one share limit to acquisitions of Gamestop, further causing the value of Gamestop to decrease.

185.     Brokerage Defendants instituted similar restrictions as to other Relevant Securities.





186.     Each artificial limitation in the amount of securities a Retail Investor could purchase correlated with a subsequent decrease in stock value. As purchases of the Relevant Securities were limited, more investors were pressured to sell who otherwise would not have in the presence of a free and open market.

187.     The full extent and scope of the conspiracy is still as of yet unknown. Plaintiffs believe the anticompetitive scheme is ongoing. In the evening of January 29, 2021, Defendant Robinhood announced it was increasing the number of restricted stocks

from 13 to 50. On January 30, 2021, Reuters reported that Defendant IG Group was continuing to suspend trading in the Relevant Securities.

***Defendants' Customer Agreements Are Not a License to Defraud***

188.     It is expected that the Defendants, particularly the Brokerage Defendants, will argue that the customer agreements Plaintiffs and the members of the class executed to open brokerage accounts contain agreements wherein they expressly agreed to hold the Brokerage Defendants harmless for any interruptions of service, regardless of the cause, and/or agreed that the Brokerage Defendants could prohibit or restrict trading at their discretion. These "hedge clauses" have been deemed per se violations of the federal securities laws by the SEC and void as against public policy.[1]

189.     A hedge clause is a contractual provision that many brokerage and investment firms include in their client agreements to limit the firms' liability from their acts of malfeasance. Since 1951 the SEC has deemed these types of clauses improper and their inclusion per se violations of the federal securities laws.

190.     Many of the Defendants have employed such clauses holding themselves immune from liability and absolving themselves for the acts alleged herein, essentially giving the Defendants a license to defraud and perpetrate the anticompetitive scheme putting their interests above those of their customers.

191.     As well as being impermissible by the SEC, the hedge clauses within the

---

[1] Investment Advisors Act Release No. 58, 1951 WL 1363 (Apr. 10, 1951) (further ratified by Investment Advisors Act Release No. 5248, 2019 WL 3779889 (June 5, 2019)).

customer agreements are void as against public policy. Indeed, there exists, pursuant to federal and state securities laws as well as self-regulatory organizations, public policy to hold broker-dealers accountable for their actions and ensure the protection of the investing public. To allow the Defendants to use these improper indemnification clauses to shield themselves from liability would directly contravene this policy.

## CLAIMS FOR RELIEF

### COUNT ONE
### CONSPIRACY TO RESTRAIN TRADE
### IN VIOLATIONOF SECTION 1 OF THE SHERMAN ACT,
### 15 U.S.C. § 1
### (Against All Defendants)

192.    Plaintiffs hereby incorporate by reference the factual allegations as set forth above.

193.    On information and belief, the Defendants conspired and entered into an anticompetitive scheme to fix, raise, stabilize, maintain, or suppress the price of the Relevant Securities.

194.    Faced with potentially disastrous losses due to their illegal short position, the Fund Defendants, rather than engage in competition, conspired, combined, agreed, and colluded with the Brokerage Defendants and Clearinghouse Defendants to restrict purchases in stocks by retailer investors and to manipulate and artificially suppress the price of stock, through which they could cover their short positions.

195.    Defendants conspired and agreed with one another with the intent to artificially lower the price of the relevant stocks.

196.    Defendants coordinated a collective shutdown of the stock brokerage

55

market with respect to the Relevant Securities, prohibiting market participants with the exception of the Fund Defendants from purchasing stock in the Relevant Securities. Pursuant to the conspiracy, the restriction of stock purchases resulted in a sell-off of stocks, driving down prices in the Relevant Securities to levels that would not have been obtained, but for the conspiracy, combination, agreement, and restraint of trade.

197.    In furtherance of the conspiracy, combination, agreement, and restraint of trade, on January 27, 2021, after the close of the stock market and before the open of the market the next day, the Fund Defendants coordinated and planned increased short volumes in anticipation of short calls on January 28, 2021.

198.    In furtherance of the conspiracy, combination, agreement and restraint of trade, the Brokerage Defendants have prohibited, continue to prohibit, or unreasonably restrict the purchases of shares of the Relevant Securities by Plaintiffs in restraint of trade.

199.    As a direct and intended result of Defendants' contract, combination, agreement, and restraint of trade or conspiracy, Defendants caused injury to Plaintiffs by restricting purchases of Relevant Securities. The Brokerage Defendants deactivated the buy option on their platforms, thereby preventing Class members from purchasing stock in the Relevant Securities.

200.    Pursuant to the contract, combination, agreement, conspiracy, and restraint of trade, the Brokerage Defendants permitted the Fund Defendants to purchase stocks at the artificially deflated prices. The Fund Defendants, who were in exposed short positions due to the short squeeze, purchased the artificially price-suppressed stocks to cover their

short positions.

201.     Not all brokerages joined in the anticompetitive scheme with the Brokerage

Defendants. To induce compliance and to limit the effects non-complying brokerages

could have in disrupting Defendants' anticompetitive scheme, the Clearinghouse

Defendants raised the fees and/or removed the ability to fill purchases of the Relevant

Securities to the non-conspiring brokerages, further facilitating the Fund Defendants

covering of their short positions in furtherance of the conspiracy.

202.     Defendants' anticompetitive and unlawful conduct is per se illegal.

203.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

and Class members were injured in their business and property.

204.     Plaintiffs and the Class further seek equitable and injunctive relief pursuant

to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the

anticompetitive effects caused by Defendants' unlawful conduct.

### COUNT TWO
### CONSPIRACY TO RESTRAIN TRADE
### IN VIOLATION OF THE MINNESOTA ANTITRUST LAW OF 1971
### Minn. Stat. §§ 325D.51, *et seq.*
### (Against All Defendants)

205.     Plaintiffs hereby incorporate by reference the factual allegations as set forth

above.

206.     On information and belief, the Defendants and their conspirators entered

into an unlawful agreement and engaged in a continuing unlawful trust in restraint of

trade and commerce as described herein in violation of Minn. Stat. §§ 325D.51, *et seq.*, to

fix, stabilize, maintain, or suppress the price of the Relevant Securities.

207.    Faced with potentially disastrous losses due to their illegal short position, the Fund Defendants, rather than engage in competition, conspired, combined, agreed and colluded with the Brokerage Defendants and Clearinghouse Defendants to restrict purchases in stocks by retailer investors and to manipulate and artificially suppress the price of stock, through which they could cover their short positions.

208.    Defendants conspired and agreed with one another with the intent to artificially lower the price of the Relevant Securities. Defendants agreed to pool, combine, or directly or indirectly unite their interests such that the price of the Relevant Securities would be fixed, stabilized, maintained, and/or suppressed.

209.    Defendants coordinated a collective shutdown of the stock brokerage market with respect to the Relevant Securities prohibiting market participants with the exception of the Fund Defendants from purchasing stock in the Relevant Securities. Pursuant to the conspiracy, the restriction of stock purchases resulted in a sell-off of stocks, driving down prices in the Relevant Securities to levels that would not have been obtained, but for the conspiracy, combination, agreement, and restraint of trade.

210.    In furtherance of the unlawful trust and restraint of trade, on January 27, 2021, after the close of the stock market and before the open of the market the next day, the Fund Defendants coordinated and planned increased short volumes in anticipation of short calls on January 28, 2021.

211.    In furtherance of the unlawful trust and restraint of trade, the Brokerage Defendants have prohibited, restricted, and continue to prohibit and unreasonably restrict the purchases of shares of the Relevant Securities by Plaintiffs in restraint of trade.

212.     As a direct and intended result of Defendants' contract, combination, agreement, and restraint of trade or conspiracy, Defendants caused injury to Plaintiffs by restricting purchases of Relevant Securities. The Brokerage Defendants deactivated the buy option on their platforms, thereby preventing Class members from purchasing stock in the Relevant Securities.

213.     Pursuant to the unlawful trust and restraint of trade, the Brokerage Defendants permitted the Fund Defendants to purchase stocks at the artificially deflated prices. The Fund Defendants, who were in exposed short positions due to the short squeeze, purchased the artificially price-suppressed stocks to cover their short positions.

214.     Not all brokerages joined in the anticompetitive scheme with the Brokerage Defendants. To induce compliance and to limit the effects non-complying brokerages could have in disrupting Defendants' anticompetitive scheme, the Clearinghouse Defendants raised the fees for consummating purchases of the relevant stocks to the non-conspiring brokerages, further facilitating the Fund Defendants covering of their short positions in furtherance of the conspiracy.

215.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members were injured in their business and property.

216.     Plaintiffs and the Class seek treble damages and their cost of suit, including attorneys' fees, equitable and injunctive relief pursuant to Minn. Stat. §§ 325D.51, et seq., and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## COUNT THREE
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against the Brokerage Defendants)

217.    Plaintiffs hereby incorporate by reference the factual allegations as set forth above.

218.    Plaintiffs and members of the Class entered into agreements with the Brokerage Defendants. They agreed to Brokerage Defendants' Terms and Conditions by using the Brokerage Defendants' websites, apps, and trading platforms.

219.    Plaintiffs and members of the Class fulfilled and performed their obligations under these contracts by adhering to their terms and using Brokerage Defendants' trading services through its website and trading platform.

220.    The Brokerage Defendants impliedly promised they would not do anything to unfairly interfere with the rights of any other party to receive the benefits of the contract.

221.    The Brokerage Defendants did not act in good faith or with honesty of purpose. To the contrary, they acted with the intention of misleading, or taking unfair advantage, of Plaintiffs and the Class. by failing to provide services it agreed to provide, mainly facilitating Plaintiffs and the class ability to trade Relevant Securities.

222.    Plaintiffs and all those similarly situated were permitted to, and actually did, trade Relevant Securities via the Brokerage Defendants' websites, apps, and trading platforms prior to implementation of The Conspiracy.

223.    The Brokerage Defendants unfairly interfered with the rights of Plaintiffs to

receive the benefits of the agreements by, among other things: (i) failing to provide services necessary to carry out a trade; (ii) failing to provide certain trading services whatsoever; (iii) failing to inform individuals in a timely member of the drastic changes in trading abilities; and (iv) prohibiting plaintiffs from buying Relevant Securities for the Brokerage Defendants own interest and not disclosing those interest to Plaintiffs and all Class members.

224.     The Brokerage Defendants' conduct has caused Plaintiffs and members of the Class harm, losses, and damages.

## COUNT FOUR
### NEGLIGENCE
**(Against the Brokerage Defendants)**

225.     Plaintiffs hereby incorporate by reference the factual allegations as set forth above.

226.     The Brokerage Defendants had a common law duty to exercise reasonable care in conducting and facilitating transactions for its customers.

227.     The Brokerage Defendants had a common law duty to exercise reasonable care in providing trades on the free and open market for its customers.

228.     The Brokerage Defendants unlawfully breached their duties by, among other things, (i) removing the Relevant Securities without notice from their websites, apps and trading platforms; (ii) failing to provide financial services related to Relevant Securities; and (iii) failing to notify Retail Investors in a timely manner of the prohibition in purchasing of the Relevant Securities.

229.     The Brokerage Defendants' conduct departed from the ordinary standard of

care expected of a stockbroker. If volatility was truly a concern, trading entirely should have been halted in the Relevant Securities. Instead, the Brokerage Defendants permitted Retail Investors to only sell their positions in the Relevant Securities. Further, non-Retail Investors were permitted to trade in the Relevant Securities without restriction.

230.    The Brokerage Defendants breached their duty of care to the Retail Investors by selectively restricting purchases of Relevant Securities to the Retail Investors who wanted to purchase stock in the Relevant Securities.

231.    Brokerage Defendants negligent and wrongful breaches of its duties owed to Plaintiffs and Class members proximately caused losses and damages that would not have occurred but for the Brokerage Defendants' gross breach of their duty of care.

232.    Plaintiffs and Class members suffered actual injury as a result of Brokerage Defendants' breach of their duty.

233.    Plaintiffs and Class members' injury was proximately and directly caused by Brokerage Defendants breach of their duty.

## COUNT FIVE
### NEGLIGENCE PER SE
### (Against the Brokerage Defendants)

234.    Plaintiffs hereby incorporate by reference the factual allegations as set forth above.

235.    The Brokerage Defendants had a statutory duty to exercise reasonable care in conducting and facilitating transactions for its customers.

236.    The Brokerage Defendants had a statutory duty to exercise reasonable care in providing trades on the free and open market for its customers.

237. The Brokerage Defendants unlawfully breached their duties by, among other things, (i) removing the Relevant Securities without notice from their websites, apps and trading platforms; (ii) failing to provide financial services related to Relevant Securities; and (iii) failing to notify Retail Investors in a timely manner of the prohibition in purchasing of the Relevant Securities.

238. The Brokerage Defendants' conduct departed from the ordinary standard of care expected of a stockbroker. If volatility was truly a concern, trading entirely should have been halted in the Relevant Securities. Instead, the Brokerage Defendants permitted Retail Investors to only sell their positions in the Relevant Securities. Further, non-Retail Investors were permitted to trade in the Relevant Securities without restriction.

239. The Brokerage Defendants breached its duty of care by selectively restricting purchases of Relevant Securities to the Retail Investors who wanted to purchase more stock in the Relevant Securities.

240. The Brokerage Defendants' negligent and wrongful breaches of the duties owed to Plaintiffs and Class members proximately caused losses and damages that would not have occurred but for the Brokerage Defendants' gross breach of their duty of care.

241. Plaintiffs and Class members suffered actual injury as a result of Brokerage Defendants' breach of their duty.

242. Plaintiffs and Class members' injury was proximately and directly caused by Brokerage Defendants' breach of their duties.

**COUNT SIX**
**BREACH OF FIDUCIARY DUTY**
**(Against the Brokerage Defendants)**

243.    Plaintiffs hereby incorporate by reference the factual allegations as set forth above.

244.    As licensed providers of financial services, the Brokerage Defendants at all relevant times herein were fiduciaries to the Plaintiffs and Class members and owed them the highest good faith and integrity in performing its financial services on their behalf. Each Brokerage Defendant also acted as a fiduciary to each and every customer who agreed to their respective terms and conditions.

245.    The Brokerage Defendants breached their fiduciary duties to Plaintiffs and Class members by, among other things, failing to disclose  its platform was going to remove Relevant Securities purchases in a timely manner; actually removing Relevant Securities; removing Relevant Securities for their own pecuniary benefits; misrepresenting and omitting material information; that the Brokerage Defendants failed to provide access to its financial services in a timely manner; that Brokerage Defendants failed to comply with all applicable legal, regulatory, and licensing requirements; and that Brokerage Defendants failed to exercise trades and actions requested by customers in a complete and timely manner.

246.    The Brokerage Defendants' conduct has caused the Plaintiffs and Class members' harm, losses, and damages and continues to expose them to harm because the Brokerage Defendants continue to breach their fiduciary duties.

<u>**COUNT SEVEN**</u>
**CONSTRUCTIVE FRAUD**
**(Against the Brokerage Defendants)**

247.    Plaintiffs hereby incorporate by reference the factual allegations as set forth above.

248.    The Brokerage Defendants had a duty to exercise reasonable care in conducting and facilitating securities transactions for its customers.

249.    The Brokerage Defendants owed the Plaintiffs and Class members a fiduciary duty to fully disclose material facts as relates to their brokerage relationship.

250.    The Brokerage Defendants represented to Plaintiffs and Class members they were brokerage services offering free and fair trading in the stock market.

251.    Plaintiffs and Class members chose to use the Brokerage Defendants websites, apps and trading platforms in part due to assurances that they would be able to trade on the stock market.

252.    The Brokerage Defendants subsequently and selective restricted and limited the securities that Plaintiffs and Class members were able to buy on their websites, apps and trading platforms, contrary to their representations.

253.    Plaintiffs and Class members' reliance on the Brokerage Defendants' false representations were substantial factors in causing Plaintiffs' harm as they were prohibited from trading freely given the Brokerage Defendants' restrictions.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request the Court enter judgment on their behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

254.    This action may proceed as a class action, with Plaintiffs serving as Class Representatives, and with Plaintiffs' counsel as Class Counsel;

255.    Defendants have contracted, combined, and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

256.    Plaintiffs and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

257.    Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

258.    Plaintiffs and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

259.    Plaintiffs and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

        a.    A judicial determination declaring the rights of Plaintiffs and the Class, and the corresponding responsibilities of Defendants;

        b.    Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the

respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from continuing and maintaining the conspiracy or agreements herein;

      c.      A constructive trust over any ill-gotten property or assets, including but not limited to stocks in the Relevant Securities received as a result of the conspiracy or agreement or other wrongful conduct as alleged herein;

260.    Plaintiffs and the Class receive such other or further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated:  March 11, 2021               Respectfully submitted,

                          *s/ David A. Goodwin*
                          David A. Goodwin (#386715)
                          Daniel E. Gustafson (#202241)
                          Daniel C.  Hedlund (#258337)
                          Kaitlyn L. Dennis (#397433)
                          **GUSTAFSON GLUEK PLLC**
                          Canadian Pacific Plaza
                          120 South 6th Street, Suite 2600
                          Minneapolis, MN 55402
                          Telephone: (612) 333-8844
                          Facsimile: (612) 339-6622
                          dgoodwin@gustafsongluek.com
                          dgustafson@gustafsongluek.com
                          dhedlund@gustafsongluek.com
                          kdennis@gustafsongluek.com

Scott D. Hirsch, Esq.
**SCOTT HIRSCH LAW GROUP,**
**PLLC**
6810 N. State Road 7
Coconut Creek, FL 33073
Telephone: (561) 569-7062
Scott@scotthirschlawgroup.com
* *pro hac vice* motion forthcoming

***Attorneys for Plaintiffs***